

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHNSON BANK,                          )
                                       )
   Plaintiff,           )
                                       )
v.                                     ) No. 01 C 2678
                                       )
GEORGE KORBAKES & CO., LLP,            ) Judge Rebecca R. Pallmeyer
                                       )
   Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Johnson Bank (the "Bank") filed suit against Defendant George Korbakes & Co.,

LLP ("GKCO") alleging claims for breach of contract and negligent misrepresentation[1] in connection

with GKCO's year-end 1998 audit of Brandon Apparel Group, Inc. ("Brandon"). The Bank, which

had already loaned Brandon some $10 million, claims that it extended additional credit to Brandon

in reliance on the Audit, and that it suffered resulting damages when Brandon's business failed a

short time later. The Bank contends that if GKCO had prepared an accurate financial statement,

it would not have made additional loans to Brandon and would have called in the loans sooner such

that the Bank would have collected a much larger portion of the sums Brandon owed. The court

held a bench trial to resolve the matter. For the reasons explained below, the court concludes that,

even if the Bank can show the GKCO Audit was flawed in certain respects, it has not met its burden

of establishing that it reasonably relied on the Audit in extending credit to Brandon. Nor has the

Bank presented evidence from which the court could determine the damages, if any, suffered by

the Bank. As a result, the court enters judgment in favor of Defendant GKCO.

---

[1] The Bank's Verified Amended Complaint alleges a claim for professional negligence.
(Cmplt., Count II, ¶¶ 16-19.) The Bank's post-trial memorandum, however, asserts a claim for
negligent misrepresentation. (Plaintiff's Proposed Findings of Fact and Conclusions of Law
(hereinafter "Pl. Mem."), at 33 ¶¶ 9-12, 20, 21.) For purposes of this opinion, the court assumes
that the Bank seeks to recover for negligent misrepresentation.

## BACKGROUND

The Bank is a state banking association, chartered pursuant to Chapter 221 of the Wisconsin Statutes. The Bank maintains its principal place of business in Racine, Wisconsin. (UF ¶ 1.)[2] GKCO is a limited liability partnership with its principal place of business in Burr Ridge, Illinois. GKCO's two partners, George P. Korbakes and Barry L. Gershinzon, both reside and work in Illinois. The court has diversity jurisdiction over the parties' dispute pursuant to 28 U.S.C. § 1332(a). (Id. ¶¶ 2, 3.)

### A.    The Bank's Relationship with Brandon

Brandon was a company engaged in the manufacture, distribution, and sale of children's and adults' casual apparel throughout the United States. (Id. ¶ 4.) Brandon had licensing agreements with a number of colleges and universities, as well as sports organizations including Major League Baseball ("MLB"), the National Football League ("NFL"), and the National Basketball Association ("NBA"). (Tr. 122.)

On May 12, 1997, Brandon entered into a borrowing relationship with the Bank. Specifically, Brandon received a $5 million term loan and a $4 million revolving line of credit ("LOC#1"), both personally guaranteed by Brandon's two owners, President Bradley A. Keywell and Secretary Eric P. Lefkofsky.[3] (UF ¶¶ 5, 6, 8, 9, 13.) In connection with the term loan, Brandon signed a Term Loan Agreement, a Term Note, a Real Estate Mortgage Security Agreement and Fixture Filing (with Assignment of Rents), and a Security Agreement - Term Loan, agreeing to repay the loan in monthly installments of $80,445.29 due on the first day of each month, with the full balance due by June 1, 2004. (Id. ¶ 5; Exs. 1-4.)

---

[2]    The parties' Statement of Uncontested Facts, Schedule A to the Final Pretrial Order, is cited as "UF ¶ __."

[3]    The term loan was also guaranteed by the U.S. Department of Agriculture ("USDA") for up to 80% of the outstanding principal balance. (UF ¶ 14.)

In connection with LOC#1, Brandon signed a Revolving Credit Loan Agreement, a Revolving Credit Note, and a Security Agreement - Revolving Credit Loan. LOC#1 allowed Brandon to borrow up to $4 million subject to a "Borrowing Base," defined as 80% of eligible accounts receivable, plus 50% of eligible inventory. The Agreement defined "eligible accounts" as accounts receivable that were not more than 90 days past due. (Tr. 717 (Wolfe); Revolving Credit Loan Agreement of 5/12/97, Ex. 6, at 8.) For purposes of the "eligible inventory" component, the Bank would only lend Brandon up to 50% of the value of its raw material and 50% of the value of finished inventory, both on a first-in, first-out ("FIFO") basis. (Tr. 718 (Wolfe); Exs. 6, 16.) Eligible inventory was initially capped at $1.5 million, but the cap was later raised to $3.5 million[4]; that is, the Bank would not loan money to Brandon under the line of credit in an amount that exceeded the eligible inventory cap. (UF ¶ 6; Revolving Credit Loan Agreement of 5/12/97, Ex. 6; Tr. 624-25, 718-20; Exs. 7-9.)

By May 16, 1997, the Bank had extended to Brandon the full $5 million value of the term loan. (Tr. 720-21; Ex. 5.) In late 1997 or early 1998, Brandon requested that the Bank provide it with additional credit for working capital purposes. The Bank agreed and, in March 1998, established a third credit facility with Brandon, consisting of a $2 million revolving line of credit ("LOC#2"). LOC#2 was subject to the same Borrowing Base as LOC#1. (UF ¶ 7.) In connection with the two revolving lines of credit, Brandon was required to furnish the Bank with monthly statements—called "borrower's certificates"—setting forth the eligible inventory and accounts receivable. The borrower's certificates were prepared without input from GKCO and had to be certified by Brandon's chief financial officer or president as being true, correct, and complete. (*Id.* ¶ 33; Tr. 952.) With only a few exceptions, Brandon did submit the required monthly borrower's

---

[4]      The parties do not indicate how or when the cap was raised, or identify the individuals involved in that decision.

certificates between June 1997 and September 1999.[5] (Ex. 16.) As of December 31, 1998, Brandon's debt to the Bank totaled $9,354,093, consisting of $4,175,675 due on the term loan; $4 million due on LOC#1; and $1,178,418 due on LOC#2. At that time, the term loan was due to mature in June 2004; LOC#1 was due to mature on May 1, 1999; and LOC#2 was due to mature in March 1999. (Id. ¶¶ 12, 13.)

By the end of 1998, the Bank had determined that Brandon was no longer a good credit risk and decided that it wanted to transfer Brandon's loans out of the Bank. By early 1999, the Bank had told Brandon's owners to look for other sources of financing. (Tr. 902-03, 905-06 (Wolfe).) Nevertheless, in January 1999, Thomas Wolfe, Senior Vice President of the Bank, and others working at his direction, prepared a loan presentation to the Bank's loan committee requesting approval to renew LOC#1 and LOC#2, and to increase the total line of credit from $6 million to $6.5 million. The Bank approved the request in late January 1999. (UF ¶ 16; Tr. 881-82; Ex. 13, Loan Presentation of 1/26/99.) When LOC#2 matured in March 1999, moreover, the Bank renewed the loan for 30 days until May 1, 1999. (Tr. 906-07.) In addition, during 1998 and part of 1999, the Bank extended still more credit to Brandon by issuing letters of credit. (UF ¶ 15.) As of April 30, 1999, Brandon's outstanding debt due to the Bank (excluding letters of credit and overdrafts) was greater than $9,900,000. Brandon also had a $40,000 negative balance in its checking account at the Bank, and the Bank had issued a letter of credit on Brandon's behalf with an exposure of approximately $51,000. It is undisputed that the Bank's total exposure to Brandon as of April 30, 1999 was approximately $10 million. (Id. ¶ 17.)

---

[5]    For reasons not explained in the record, Brandon did not submit borrower's certificates for November 1997; January, February, August, or December 1998; or July 1999. (Ex. 16.)

4

## B. The GKCO Audit

In December 1998, Brandon engaged GKCO to perform an audit for the year ending December 31, 1998. (*Id.* ¶ 18.) The engagement letter, dated December 1, 1998, did not reference the Bank in any way, but did indicate that GKCO was expected to perform the audit in conformance with generally accepted auditing standards ("GAAS"). (*Id.* ¶ 38; Letter from GKCO to Brandon of 12/1/98, Ex. 57A, at GK0084-85.) GKCO performed field work for the audit during the first quarter of 1999, including an inventory count conducted on January 8, 1999. (*Id.* ¶¶ 18, 46.)

### 1. The Bank Waives Financial Covenant Violations

During the course of the audit, GKCO determined that Brandon was in violation of certain financial covenants associated with the term loan and the two revolving lines of credit. (Tr. 72.) One of those covenants required that Brandon have a consolidated tangible net worth in an amount no less than $1,500,000 (the "net worth covenant").[6] A second financial covenant required Brandon to maintain a debt-to-tangible-net-worth ratio not greater than 3.5 to 1.0 (the "net worth ratio covenant"). A third financial covenant required Brandon to have a ratio of assets to liabilities of not less than 1.5 to 1.0 (the "current ratio covenant"). (UF ¶¶ 19, 40, 42; Ex. 6.) As of December 31, 1998, Brandon's consolidated tangible net worth was only $1,078,784, some $400,000 less than the minimum required. In addition, Brandon's net worth ratio was 10.33 to 1, well above the required 3.5 to 1. (Tr. 748-50.) Barry Gershinzon of GKCO informed Brandon of these covenant violations and indicated that GKCO would have to include a "going concern" qualification in its audit

---

[6]     The revolving line of credit documents defined "consolidated tangible net worth" as "the total of all assets properly appearing on the consolidated balance sheet of the Borrower [Brandon] in accordance with GAAP, plus the amount of subordinated debt owed by Borrower to Cap and Helen Ann Pearson," less various other items, including intangibles such as goodwill. (Tr. 745-46; Ex. 6, at 8, § (d).) *See infra* pp. 6-10 for a discussion of the Pearson liability.

report unless the Bank agreed to waive the violations.[7] (Tr. 72, 230; Memorandum from B. Keywell to T. Wolfe of 4/28/99, Ex. 57A, at GK0087.)

On April 14, 1999, Eric Lefkofsky of Brandon sent Thomas Wolfe at the Bank a copy of GKCO's audit work papers, which were still in the process of being translated into a final audit report. (Memo from E. Lefkofsky to T. Wolfe of 4/14/99, Ex. 17.) Sometime between April 14 and 29, 1999, Wolfe had a conference call with Gershinzon of GKCO, Lefkofsky, and Keywell. (Tr. 543-44 (Wolfe).) The men discussed a reclassification of accounts receivable to prepaid expenses in the amount of $653,857. (Tr. 544-46.) Wolfe claims that he was assured by either Lefkofsky or Gershinzon that the reclassification was appropriate. (Tr. 545.)

The three men also discussed the treatment of a $1 million promissory note held by Pearson. Brandon's current owners (Keywell and Lefkofsky) had purchased the assets of Brandon from Pearson Properties, Ltd. and its two owners, Clyde Pearson and Helenann Pearson, (collectively "Pearson"), in August 1994.[8] *Brandon Apparel Group, Inc. v. Pearson Properties, Ltd.*, 221 Wis.2d 597, 586 N.W.2d 699 (Wis. Ct. App. 1998). At the time of the Audit, Brandon and its owners were involved in a lawsuit charging Pearson with having sold defective manufacturing equipment. *Id.* Pearson, in turn, had filed a counterclaim alleging that Brandon still owed $1 million on the purchase price. (Tr. 1217.) *See Brandon Apparel Group, Inc. v. Pearson Properties, Ltd.*, 247 Wis.2d 521, 634 N.W.2d 544 (Wis. Ct. App. 2001). GKCO's work papers treated Brandon's

---

[7]     A "going concern" qualification is "universally dreaded by corporate management." *See S.E.C. v. Spiegel, Inc.*, No. 03 C 1685, 2003 WL 22176223, at *22 (N.D. Ill. Sept. 15, 2003). *See also Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 755 F.2d 293, 299 (2d Cir. 1985) (a "going concern opinion" is a "most serious qualification on a financial statement because it generally indicates an auditor's opinion that a company is faced with a serious risk of bankruptcy, and, therefore, that valuation of its assets as part of a going concern may be incorrect.")

[8]     It is not clear how Clyde Pearson and Helenann Pearson are related.

6

claim against Pearson as a "contra liability," meaning it functioned as an offset against liability.[9] Wolfe testified that when he asked Gershinzon and Lefkofsky about the contra liability, Lefkofsky explained that Brandon was confident that it would prevail in its lawsuit against Pearson and, thus, decided to reclassify the debt as an asset. (Tr. 546-47.) Wolfe did acknowledge, however, his understanding that if Brandon lost the Pearson lawsuit, the $1 million contra liability would be eliminated. (Tr. 549.)

On April 28, 1999, Brad Keywell sent a written memorandum to Wolfe at the Bank requesting that the Bank waive the financial covenant violations (i.e., the net worth covenant, the net worth ratio covenant, and the current ratio covenant) as of December 31, 1998. (UF ¶¶ 20, 44; Memorandum from B. Keywell to T. Wolfe of 4/28/99, Ex. 18.) The Bank agreed to waive the violations, as reflected in an April 29, 1999 letter to Keywell from Wolfe. (Id. ¶¶ 21, 45; Letter from Wolfe to Keywell of 4/29/99, Exs. 18, 224.)

## 2. The Audit Report

Also on April 29, 1999, GKCO issued its audit report (the "Audit") and sent a copy to Wolfe at the Bank, which he received during the first week of May 1999. (Id. ¶ 18.) The Audit stated that "[t]he financial statements referred to above present fairly, in all material respects, the financial position of Brandon Apparel Group, Inc. as of December 31, 1998, and the results of its operations and its cash flows for the year then ended in conformity with generally accepted accounting principles." (Id. ¶ 39.)

In light of the Bank's agreement to waive Brandon's financial covenant violations, the Audit did not include a going concern qualification. (Id. ¶ 41.) It did, however, include a variety of determinations that, in the Bank's view, violated Generally Accepted Accounting Principles

---

[9]      "Contra liabilities" are "liability accounts with debit balances. (A debit balance in a liability account is contrary – or contra – to a liability account's usual credit balance.)" (See http://www.accountingcoach.com/free_accounting_help/05Xpg01.html.)

7

("GAAP"), Generally Accepted Auditing Standards ("GAAS"), and the opinions of the Financial Accounting Standards Board (the "FASB").[10]

### a. Contra Liability

As noted, the Audit treated Brandon's $1 million debt to Pearson as a "contra liability" account, stating in Note 4 that:

> The Company is currently a Plaintiff in a lawsuit against Pearson Properties, Ltd. (f/k/a Brandon, Inc.), wherein they allege that Pearson Properties, Ltd. misrepresented the value of the assets sold and liabilities assumed in the acquisition of the business. Although the lawsuit is in excess of $1,000,000 due to damages, the Company has limited its recognition of the contra liability to the amount of the note payable to Pearson Properties, Ltd. Should the Company not prevail in the lawsuit, the $1,000,000 will be reclassified to goodwill, representing an additional amount paid at acquisition in excess of the fair market value of the assets acquired.

(Audit of 12/31/98, Ex. 57A, at GK0078; Tr. 66.)

According to the Bank's accounting expert, Professor Larry E. Rittenberg of the University of Wisconsin, characterizing a debt as a contra liability has the effect of "essentially saying that the liability no longer exists," which in turn causes an increase in a company's retained earnings. (Tr. 25-26, 65.) Professor Rittenberg explained that with respect to the $1 million promissory note owed to Pearson, "you are decreasing liabilities in this case by a million dollars and you are increasing equity, in this case retained earnings, by a million dollars." (Tr. 65-66.) The flaw in such an approach, Professor Rittenberg stated, is that the claim against Pearson should have been treated as a "gain contingency," which is "an existing condition, situation, or set of circumstances involving varying degrees of uncertainty that may, through one or more related future events, result in the

---

[10] GAAP are "the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889-90 (8th Cir. 2002). GAAS are the standards which "govern the conduct of external audits by public accountants." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 386 n.42 (D. Md. 2004). *See also Potts v. S.E.C.*, 151 F.3d 810, 812 (8th Cir. 1998) (GAAS are "well-established norms of the accounting profession").

acquisition or loss of an asset or the incurrence or avoidance of a liability."[11] *Morrison v. Mahaska Bottling Co.*, 39 F.3d 839, 846 (8th Cir. 1994) (quoting *Miller Comprehensive GAAP Guide*, at 7.01 (1993)). According to Professor Rittenberg, the Audit thus "recognize[d] an anticipation of an accounting gain" in violation of FASB No. 5, which requires that "gain contingencies are not to be recognized until they are realized." (Tr. 66-67.)

Professor Rittenberg believes that this improper treatment made Brandon "look much healthier than it would have looked had not this gain been recognized on the financial statements." (Tr. 68.) Specifically, it allowed Brandon to increase stockholders' equity by $1 million and increase retained earnings by $1 million; it kept Brandon's debt-to-equity ratio within the 3.5 to 1 range required by the financial covenants under the loan documents; and it allowed Brandon to state a tangible net worth in excess of the $1,500,000 required by the loan documents. (Tr. 68, 71-72, 79-80.) In Professor Rittenberg's view, if the Audit had treated the promissory note as a gain contingency, then Brandon's debt-to-equity ratio would have been as high as 36 to 1, and its consolidated tangible net worth would have been as low as $696,000, both in violation of the financial covenants. (Tr. 71-72, 79-80.)

GKCO points out that the Audit expressly disclosed that the contra liability was recorded to offset the $1 million note obligation to Pearson, and that the Bank understood that the indebtedness reflected in that note was subordinate to the Bank. (Audit of 12/31/98, Ex. 57A, at GK0078; Tr. 973 (Wolfe).) Specifically, in addition to Note 4 above, the Audit disclosed in Note 10, entitled "Debt," that:

> The Pearson Note, which is subordinate to the Bank and SBA debt, matures in August, 2004 and requires monthly interest at prime plus 3%, with a minimum rate of 10%. This Note is subordinate to the bank and SBA loans. As discussed in

---

[11]     Rittenberg's testimony from time to time appears to presume that this "contra liability" entry is the only reference in the audited statement to Brandon's dispute with Pearson. In fact, the court notes that the Pearson promissory note was listed in the audited statement as long term debt (see note 10). That debt was subordinated to Brandon's indebtedness to the Bank.

> Note 4, the Company has recorded a $1,000,000 contra liability against this loan. There is no security on the Pearson note, however default on payment allows the holder to exercise an option to convert the note to equity.

(Audit of 12/31/98, Ex. 57A, at GK0080.) GKCO claims that it properly recorded "an offset which Brandon had taken against the Pearson note, with adequate disclosure that Pearson disputed the offset and was suing Brandon for the sums due on the $1 Million note obligation." (Def. Mem. at 26 ¶ 94.)[12] Wolfe testified that though he thought the contra liability was "unusual," he never asked for an explanation and understood that it did not reflect an asset on Brandon's account. (Tr. 968-69, 971-72.)

### b.     Midwest Cadre Contract

Brandon had a contractual relationship with Midwest Cadre ("Midwest") that allowed Midwest to produce and sell adult wear using Brandon's licenses[13] under Brandon's name. Brandon licensed to Midwest the production, sales, design, and distribution of a second line of Brandon adult wear, and in return, Midwest agreed to report all sales of this second line and remit 17.5% of its net sales to Brandon. (Tr. 82-84, 1047.) Brandon was obligated to make royalty payments to its licensees on sales made by Midwest. (Tr. 786-87 (Wolfe).)

Professor Rittenberg observed that under this Brandon/Midwest contract, Brandon was "not at risk in selling any of these products." (Tr. 82.) The Audit nevertheless treated the 17.5% of net sales remitted by Midwest as revenue-producing activity. In Professor Rittenberg's view, this allowed Brandon to recognize $7,320,000 in sales that it had no activity in producing or selling in fiscal year 1998. Brandon's gross sales were thus recorded as approximately $19,000,000, which reflected a substantial (12%) increase from the approximately $17,000,000 in gross sales recorded

---

[12]     Defendant's Proposed Findings of Fact and Conclusions of Law is cited as "Def. Mem. at __ ¶ __."

[13]     As noted earlier, Brandon had licenses with colleges, universities, and various major league sports organizations, including the MLB, the NFL and the NBA.

for fiscal year 1997. (Tr. 83, 85-88.) If the Audit had recognized Midwest's 17.5% of net sales as Rittenberg deemed appropriate, the statement would have reflected a material decline in Brandon's sales and revenues, as well as an increase in goods returned to Brandon from 1997 to 1998. (Tr. 87-91.)

GKCO again notes that the Audit did fully disclose that $7,320,000 of the gross sales figure came from Midwest. Note 1 of the Audit specifically states:

> The Company uses a subcontractor to produce, sell and distribute its line of adult product. Under this arrangement, the subcontractor reports the sales to the Company and remits the proceeds net of the agreed upon cost. In 1998 sales of adult product amounted to approximately $7,320,000.

(Audit of 12/31/98, Ex. 57A, at GK0077.) Indeed, Wolfe testified that he understood that $7,320,000 of Brandon's gross sales came from Midwest. (Tr. 930-32.)

### c. Inventory Calculations

Professor Rittenberg takes issue with several of GKCO's calculations relating to Brandon's inventory. First, he argues that the Audit improperly includes an overhead allocation of $1.9 million in Brandon's selling costs, and treats 75% of Brandon's selling costs as "inventoriable costs." (Tr. 100-01.) Inventoriable costs are the costs of developing merchandise and getting it into position for sale (i.e., production costs). (UF ¶ 43.) Inventoriable costs include the costs of purchasing raw materials, the freight to bring the materials to the plant, the labor, and specific manufacturing overhead costs. (Tr. 97-98 (Rittenberg).) "Selling costs," on the other hand, are generally considered to be the costs of operating a business, such as accounting costs, administrative expenses, and the costs of actually selling the product. (Tr. 98-99.) In Professor Rittenberg's view, the Audit's improper allocations of inventoriable and selling costs resulted in an overstatement of Brandon's inventory and net income. (Tr. 102-03.) If the Audit had properly allocated inventoriable and selling costs, Professor Rittenberg contends, Brandon's selling costs would have increased

11

by between $1.3 million and $1.85 million, and Brandon's consolidated tangible net worth would have decreased by at least $1 million. (Tr. 109, 111.)

Professor Rittenberg also claims that the Audit improperly added a uniform $2.40 of overhead costs to each item of Brandon's inventory without testing that number. (Tr. 112-13.) In addition, the Audit failed to state inventory at the lower of cost or market, or to otherwise provide an appropriate reduction of the inventory as required by GAAP. (Tr. 120-21.) Further, the Audit's return figures with respect to Brandon's inventory purportedly failed to account for obsolescence. (Tr. 111, 124.) Finally, the Audit work papers indicate that though Brandon was not a retail business, GKCO used the retail method to determine the value of Brandon's inventory rather than actually testing the inventory pricing. (Tr. 232-33.)

GKCO urges that Professor Rittenberg's opinion on these matters is unreliable. He did not re-audit Brandon's inventory at December 31, 1998 and he has no specific knowledge as to Brandon's inventory count as of that date. (Tr. 365-66.) Nor does he know how much of Brandon's inventory was obsolete as of December 31, 1998. (Tr. 396-98.) Professor Rittenberg noted that two licensors—the NBA and MLB—had threatened to terminate their licenses with Brandon, which in the professor's mind raised questions regarding obsolescence. GKCO points out, however, that Brandon had more than 50 license agreements. (Tr. 381, 398-99.) In addition, Barry Gershinzon of GKCO testified that inventory did not in fact include improper administrative costs such as royalties, commissions, and overhead, and that he did test the $2.40 overhead cost figure rather than simply relying on Brandon's reported estimate. (Tr. 1210-13.) Gershinzon also opined that he often uses the retail method of valuing inventory for manufacturing and distributing businesses. (Tr. 1417-18.)

12

#### d.    Goodwill

Goodwill relates to the acquisition costs for a company and represents "excess of costs that you are willing to pay for because you expect to gather superior earnings." (Tr. 128, 133 (Rittenberg).) See Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555 (1993) ("goodwill" is "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers . . .") The Audit documented an increase in Brandon's goodwill by $60,000 based on Brandon's acquisition of the business from Pearson three years earlier. (Tr. 129.) The Audit also reflected, however, that during that three-year period, Brandon's business model had changed from manufacturing to distribution, its sales and profits had decreased, and it had generated losses over the entire period of its existence. (Tr. 128-29; 523-24.) In Professor Rittenberg's opinion, the Audit made an inappropriate increase for goodwill in light of these factors. (Tr. 127-32.)

#### e.    Other Issues

In addition to these problems, the Bank argues that GKCO's work papers do not reflect that it performed sufficient independent testing and analysis to complete the Audit, instead relying exclusively on an audit program. (Tr. 134, 145 (Rittenberg).) Professor Rittenberg further believes that GKCO should have consulted with Brandon's predecessor auditor because there were prior period adjustments to the Audit, mostly relating to a reduction of Brandon's retained earnings by $1,800,000 (i.e., Brandon's profits reported prior to 1998 were overstated by $1,800,000). (Tr. 145-46, 213-14.) GKCO's work papers, however, do not reflect any such consultation. (Tr. 145.) Professor Rittenberg also criticizes the Audit's failure to indicate a change in Brandon's method of accounting for inventory from a first-in, first-out ("FIFO") to a weighted average. (Tr. 243-44.) In

13

addition, Wolfe testified that if the Audit had included a going concern qualification, the Bank "more than likely" would not have extended Brandon additional advances. (Tr. 620.)

For its part, GKCO insists that its decision not to include a going concern qualification was justified for the following reasons: (1) Brandon had obtained a waiver of the financial covenant violations; (2) Brandon had a net income of nearly \$1.6 million; (3) Brandon's sales through Midwest were increasing and profitable; (4) Brandon had many valuable licenses; (5) Brandon had not been denied usual trade credit from suppliers; (6) there were no internal work stoppages or other labor problems at Brandon; (7) Brandon had remained current and was not in default of its obligations to the Bank throughout 1998; (8) Brandon had a healthy gross profit margin; and (9) Brandon was still in existence as of April 29, 1999 when GKCO issued the Audit for the year ending December 31, 1998. (Def. Mem. at 28 ¶ 104.)

## C.    Brandon's Credit Advances and Readvances

As noted, the Bank waived Brandon's financial covenant violations on April 29, 1999, before Wolfe received a copy of the Audit from GKCO. That same day, the Bank's loan committee also held a meeting, in part to discuss a request Brandon had made during the first quarter of 1999 for an extension and increase of the two revolving lines of credit, which were due to mature in May 1999. (UF ¶¶ 22, 23.) Wolfe and other unidentified individuals at the Bank prepared a written loan presentation in support of Brandon's request, and the committee agreed to combine the two lines of credit into a single line of credit, and to increase the amount available to \$6,500,000. As of this meeting, the Bank had not yet received a copy of the Audit. (Id. ¶ 23; Loan Presentation of 4/29/99, Ex. 25; Tr. 908-09.)

Brandon failed to make its term loan payment or its line of credit interest payments due on May 1, 1999, and its checking account showed a negative balance of \$40,481.09. (Tr. 722-24, 739-40; Exs. 11, 24.) By May 19, 1999, Brandon owed the Bank approximately \$100,000 on the

14

term loan and revolving lines of credit, and Bank officers knew that the negative balance in Brandon's checking account had grown to $194,193.51. (Tr. 724-25, 741 (Wolfe); Ex. 24.) Brandon's internally prepared unaudited financial statement, moreover, showed that between December 31, 1998 and March 31, 1999, Brandon's financial condition had worsened. Among other things, Brandon reported total debt to the bank that was $600,000 higher than in December 1998, with a similar decline in equity. (Tr. 753-54 (Wolfe).) In addition, on May 17, 1999, Brandon submitted a borrower's certificate (prepared without input from GKCO) reporting finished goods inventory of $7,016,150 and accounts receivable of $3,842,702. The inventory figure was approximately the same as the one reflected in the year-end 1998 Audit, but the receivable figure was approximately $1.3 million (or 50%) higher. (Tr. 625-26, 951-53; Ex. 16.)

Wolfe acknowledged that as of May 1999, the Bank could have declared Brandon to be in default on the term loan and revolving line of credit. (Tr. 724-25, 742.) Instead, as noted, the Bank allowed Brandon to execute a First Replacement Revolving Credit Note and a First Amendment to Term Loan Agreement on May 1, 1999, both of which renewed and extended Brandon's obligations under the lines of credit and term loan. (UF ¶ 6; Tr. 527-28 (Wolfe); Exs. 201, 202.) In addition, on May 17, 1999, Brandon executed a Second Replacement Revolving Credit Note confirming that it had a newly combined line of credit in the amount of $6.5 million. (Id.; Tr. 528-29; Ex. 213.) Relying on the May and June borrower's certificates, the Bank made additional advances to Brandon between May 20 and June 30, 1999 under the $6.5 million line of credit. For example, on May 20, 1999, the Bank advanced Brandon $80,445.39 by depositing that amount in its account at the Bank, and then debiting the same amount as a monthly payment on the term loan. (Tr. 576-77, 736-37, 953; Ex. 11, at 581.) Also on May 20, 1999, the Bank deposited an additional $249,000 in Brandon's checking account at the Bank to cover overdrafts in the amount of $194,193.51, and to leave a cushion in the account. (Tr. 576-77, 580, 772-74.) The Bank further advanced Brandon $66,125.05 on May 20, 1999, to enable Brandon to make two interest payments

15

to the Bank on the lines of credit (one in the amount of $44,916.67 and one in the amount of $21,208.38). (Tr. 731-34.)

The next day on May 21, 1999, the Bank advanced Brandon $16,509.56. Shortly thereafter on June 1, 1999, the Bank advanced Brandon an additional $87,920 to cover overdrafts in its checking account, which had a negative balance of $82,648.70. (Tr. 581-82, 775-76; Exs. 11, 24.) On June 22, 1999, the Bank advanced Brandon $51,375 to help cover a letter of credit that had expired without payment. (Tr. 805-12.)

By July 1999, Brandon had used up the limit on the $6.5 million line of credit and was requesting still more credit from the Bank. (UF ¶ 24.) On July 15, 1999, the Bank agreed to loan Brandon an additional $500,000 evidenced by a Business Note set to mature and be paid in full by September 1, 1999. (Id. ¶ 25.) At the time, Brandon was in default on LOC#2 because it had not paid interest due on that obligation and had not made the term loan payments due on June 1 and July 1, 1999. (Tr. 897-99.) Brandon thus used several of the advances made under the July 15, 1999 Business Note to meet those loan obligations to the Bank. Specifically, Brandon used (1) a $44,375.92 advance on July 16, 1999 to pay interest on LOC#2; (2) an $80,445.39 advance on July 16, 1999 to pay the June 1999 monthly payment on the term loan; and (3) a second $80,445.39 advance on July 16, 1999 to pay the July 1999 monthly payment on the term loan. (Tr. 895-99.)

At the time the Bank extended the July 15, 1999 loan, Brandon's loan value was $7,000,000, which was higher than the loan value reported in both the June 3, 1999 and June 28, 1999 borrower's certificates ($6,505,000 and $6,671,785, respectively). (Tr. 953-55; Ex. 16.) On August 4, 1999, Brandon paid the Bank $110,000, which the Bank advanced back to Brandon on August 5 ($50,000), August 6 ($53,000), and August 9 ($7,000). (Tr. 828-30; Exs. 11, 24.) On August 18, 1999, Brandon paid the Bank $130,000, which the Bank advanced back to Brandon on August 19 ($82,000), August 20 ($40,000), and August 23 ($8,000). (Tr. 830-31; Exs. 11, 24.) On

16

August 24, 1999, Brandon paid the Bank $32,000, which the Bank advanced back to Brandon on August 25 ($4,000) and August 26 ($28,000). (Tr. 833-34.) Finally, Brandon paid the Bank $12,000 on September 1 and 2, 1999, which the Bank advanced back to Brandon on September 3, 1999. (Tr. 834-35.)

**E.    The Moratorium Agreements**

Brandon failed to repay the Business Note by September 1, 1999. (UF ¶ 26; Tr. 874-77; Exs. 22, 24.) As a result, effective September 1, 1999, Brandon entered into a Moratorium Agreement with the Bank, acknowledging that it was in default and that the outstanding principal balance owed to the Bank was $10,824,708.51, consisting of $6,500,000 on the revolving line of credit, $3,824,708.51 owed on the term loan, and $500,000 owed on the July 15, 1999 Business Note. (Id. ¶ 27.) The Moratorium Agreement required Brandon to make four payments, each in the amount of $125,000, by October 1, 1999 to pay off the balance due on the Business Note. Brandon also agreed to pay the revolving line of credit in full by November 1, 1999. (Id.) In return, the Bank agreed to cancel a "sweep agreement" that gave the Bank the right to sweep funds in Brandon's checking account daily and apply them towards reducing the outstanding balance due on Brandon's lines of credit. (Tr. 768-69, 836-37.) Brandon paid off the July 15, 1999 Business Note in full during September and October 1999, but failed to pay off the balance due on the revolving line of credit by November 1, 1999. (UF ¶ 28.)

Effective January 21, 2000, Brandon entered into a Second Moratorium Agreement with the Bank, acknowledging that it was in default on the revolving line of credit and that the outstanding principal balance owed to the Bank as of December 28, 1999 was $10,249,709, consisting of $6,425,000 on the revolving line of credit and $3,824,709 on the term loan. (Id. ¶ 29.) The Second Moratorium Agreement required Brandon to fulfill several conditions and had a termination date on the earlier of February 15, 2000 or default by Brandon on its obligations to the Bank under the

17

agreement. (*Id.*) Brandon made one $25,000 payment to the Bank on January 31, 2000 in connection with the Second Moratorium Agreement, but made no further payments after that date. (Tr. 839, 964-65; Ex. 11, at 583.) Around that same time, Brandon ceased operations and received no further payments from outside sources. (Tr. 689 (Wolfe).) Sometime in December 1999 or January or February 2000, the Bank began liquidating Brandon's assets. (Tr. 667-69, 842-43 (Wolfe).) Brandon, however, refused to cooperate in an orderly liquidation. (Tr. 843-44.)

## F.    Brandon's Post-Audit Income

As noted, Brandon struggled financially throughout 1999 and secured numerous advances from the Bank. During this time, Brandon did continue to receive deposits in its bank account between May and December 1999, totaling $6,200,000. Of that amount, approximately $1,012,000 represented payments from Midwest. Specifically, Brandon received $24,481.93 on May 17, 1999; $129,647.46 on July 15, 1999; $182,945.98 on August 18, 1999; $237,331.84 on September 15, 1999; $245,032.05 on October 15, 1999; $100,000 on November 23, 1999; and $92,332.18 on December 23, 1999. (Tr. 628-31 (Wolfe).) Midwest also wired Brandon $68,701.81 on March 2, 2000, and made a final payment of $9,533.06 on April 27, 2000. (Tr. 856-57; Ex. 216.)

## G.    The Bank's Lawsuit Against Brandon

On March 8, 2000, the Bank filed a state court complaint against Brandon and others in Rock County, Wisconsin. The Bank also sued Keywell and Lefkofsky on the guarantees. (UF ¶ 30; Tr. 842.) The Wisconsin court entered a default judgment in favor of the Bank and against Brandon, Lefkofsky, and Keywell on September 1, 2000. Sometime in late 1999 or early 2000, the Bank commenced liquidation proceedings against Brandon. (Tr. 188.) In the meantime, Brandon and its two owners appealed the default judgment and on June 14, 2001, a Wisconsin Appellate Court reversed the judgment and remanded the case back to the trial court. On January 14, 2002, the trial court again entered a default judgment in favor of the Bank and against Brandon,

Lefkofsky, and Keywell. On February 14, 2002, the court awarded the Bank $3,725,318 in principal due on the term loan, $6,400,000 in principal due on the combined revolving line of credit, interest due on the term loan and combined revolving line of credit, and attorneys' fees and costs. (UF ¶ 31; Exs. 208-10.) As of February 29, 2000, Brandon owed the Bank $3,824,708.53 on the term loan, plus $227,951.73 in interest, plus a per diem of $956.18, plus all costs of collection, including attorneys' fees and expenses. Brandon also owed the Bank $6,400,000 on the revolving line of credit, plus $338,061.14 in interest, plus a per diem of $1,644.45, plus all costs of collection, including attorneys' fees and expenses. (Id. ¶¶ 35, 36.) The judgment against Brandon was reinstated on January 30, 2002 for the sum of $12,353,784.61, which amount remains unpaid. (Id. ¶ 37.)

After the Bank filed suit against Brandon, the company received only one more wire payment—$9,553.06 from Midwest on April 27, 2000. (Tr. 857-58.) By February 2002, the Bank had collected approximately $100,000 out of Brandon's inventory. (Tr. 676.)

## G. The Bank's Lawsuit Against GKCO

On April 16, 2001, the Bank filed this lawsuit against GKCO, alleging breach of contract and negligence in connection with GKCO's audit of Brandon for the year ending December 31, 1998. The Bank filed an amended complaint on May 25, 2001 to clarify the residency of GKCO's two partners for diversity purposes. The Bank claims that GKCO's Audit does not conform with GAAP and GAAS standards, and that the Bank was damaged when it continued to extend credit to Brandon in reliance on GKCO's inaccurate financial statements.

After lengthy settlement negotiations, the parties proceeded to a bench trial on January 12, 2004. After just one day of testimony, the court, confused regarding the Bank's damages theories, adjourned and requested briefing on that issue. On May 24, 2004, the court issued a ruling on that matter, which was later amended on June 1, 2004 to reflect typographical corrections. As more

fully discussed in that order, the Bank initially asserted three damages theories: (1) that GKCO is liable for the full amount of the Bank's judgment against Brandon, $12,353,784.61; (2) that GKCO is liable for the additional amounts the Bank loaned to Brandon after May 1999, $1,288,000; and (3) that GKCO is liable for all amounts deposited into Brandon's bank account from May to December 1999, $6,200,000. *Johnson Bank v. George Korbakes & Co.*, No. 01 C 2678, at 5 (N.D. Ill. June 1, 2004) (Doc. No. 48). The court rejected the first of these theories and expressed its doubts about the third. In response, the Bank withdrew the first and third theories but continued to press for the $1,288,000, which the court held was properly resolved at trial. *Id.* at 5, 6.

The Bank also asserted a new claim for what it called "Collateral Proceeds," which it identified as "the amounts the Bank could have realized from Brandon had the audit accurately disclosed Brandon's precarious financial condition." *Id.* at 5. The "Collateral Proceeds" claim had two components: (1) the sum of certain deposits from Brandon's sublicensee, Midwest, from May through December 1999, $1,011,000; and (2) amounts the Bank contended it would have recovered had it commenced an immediate liquidation of Brandon's assets in May 1999: $1,792,000 (representing 10% of Brandon's inventory, or approximately $700,000, plus 30% of Brandon's pending accounts receivable, or approximately $1,092,000). Thus, the Bank's total Collateral Proceeds claim totaled $2,803,000. *Id.* at 5-6, 10.

The court allowed both elements of the Bank's Collateral Proceeds theory to proceed to trial, but noted several significant fact-based defenses that "may well defeat" the Bank's claims. *Id.* at 9. With respect to the Midwest license payments, GKCO pointed out that most of those payments were made after August 18, 1999, more than three months after the Bank now contends an accurate auditing statement would have prompted it to liquidate Brandon. In addition, Brandon's actual cash balances were either very low or negative, and if the Bank had started "sweeping" deposits from Brandon's account in 1999, Brandon likely would have stopped depositing Midwest payments into that account. The court noted, further, that some of these arguments raised

20

questions "potentially answerable only by a representative of Brandon or of Midwest/Cadre," but the Bank did not identify any such representative on its witness list. *Id.* The court also expressed concern about the Bank's ability to meet its burden of showing that "a May 1999 liquidation would have generated a greater recovery to the Bank." *Id.* at 10. Specifically, the court suggested that

[i]f the amount that the Bank was able to recover in 2000 was enhanced by the fact that Brandon had been permitted to continue collecting license payments from Midwest/Cadre, the difference between the Bank's hypothetical recovery in 1999 and its actual recovery in 2000 may be much smaller than the total of Midwest/Cadre deposits.

*Id.*

A primary concern with the "percentage of recovery" component was the Bank's arguably inconsistent contentions that it could have recovered millions from Brandon in a forced liquidation in 1999, but that GKCO overstated the value of Brandon's inventory and receivables. *Id.* at 11-12. The court expressed doubts that Bank officers were capable of offering testimony to establish that the Bank would have recovered more in a May 1999 liquidation than it did when Brandon's assets were liquidated in 2000. Absent "evidence that would enable the trier of fact to calculate a more accurate estimate of Brandon's wealth in May 1999," the court had "grave concerns about the validity of the Bank's percentage-of-recovery theory." *Id.* at 12. Also troubling was the Bank's failure to disclose the "percentage of recovery" theory during discovery; the court noted that it was for that reason "inclined to sustain Defendant's objections" to testimony from Bank officers regarding Brandon's comparative assets in 1999 versus 2000. *Id.* at 11, 13.

The bench trial continued on May 25, 26, 27, and 28, 2004; on November 8, 9, and 10, 2004; on December 2, 3, and 13, 2004; and on January 10 and 11, 2005. Having heard and reviewed all the testimonial and documentary evidence in this case, the court is now prepared to rule on the Bank's claims.

## DISCUSSION

The Bank seeks to recover for third-party breach of contract and negligent misrepresentation. Under Illinois law,[14] a third party may recover damages from a breach of contract entered into by others if the third party is an intended beneficiary of that contract. To prevail on a negligent misrepresentation claim, a party must establish: (1) the defendant's duty to communicate accurate information; (2) a false statement of material fact; (3) the defendant's carelessness or negligence in ascertaining the truth or falsity of the statement; (4) defendant's intent to induce the other party to act; (5) the plaintiff's reliance on the false statement; and (6) the plaintiff's damages resulting from that reliance. *Walton Risk Servs., Inc. v. Clarendon Am. Ins. Co.*, No. 01 C 398, 2002 WL 31415769, at *3 (N.D. Ill. Oct. 25, 2002) (citing *Fremont Fin. Corp. v. IPC/Levy, Inc.*, 994 F. Supp. 988, 990 (N.D. Ill. 1998)). GKCO argues that the Bank cannot prove the elements of either claim, including duty, reliance, causation, and damages. The court considers each in turn.

### I. Duty

An accountant has a duty to a third party where the purpose and intent of the accountant-client relationship is to benefit or influence that third party. *See generally Builders Bank v. Barry Finkel and Assocs.*, 339 Ill. App. 3d 1, 790 N.E.2d 30 (1st Dist. 2003) (lender has a cause of action against the borrower's accounting firm when it relied on financial statements prepared by the firm in extending credit); *First Nat'l Bank of Sullivan v. Brumleve and Dabbs*, 183 Ill. App. 3d 987, 539 N.E.2d 877 (4th Dist. 1989) (recognizing a cause of action where certified audit failed to disclose numerous improper transactions, inducing plaintiff bank to make additional business loans). This requires a showing that (1) the client intended the accountant's work to benefit or influence the third

---

[14]     The parties agree that Illinois law governs this dispute. (*See* Pl. Mem., at 33 ¶ 13, 34 ¶¶ 14-20; Def. Mem., at 4, 29-44.)

22

party; and (2) the accountant knew of that intent. *Kopka v. Kamensky and Rubenstein*, 354 Ill. App. 3d 930, 821 N.E.2d 719, 726 (1st Dist. 2004). *See also* 225 ILCS 450/30.1; *Brumley v. Touche, Ross & Co.*, 139 Ill. App. 3d 831, 834, 487 N.E.2d 641, 644 (2d Dist. 1985).

GKCO concedes that it knew that its Audit findings would be given to the Bank. (Def. Mem., at 36.) The company claims, however, that it did not know that a primary purpose of the Audit was to influence the Bank to make additional loans to Brandon. In fact, the testimony suggests that a primary reason Brandon needed the Audit was to enable the Bank to rectify a former employee's error. The loan officer responsible for the Brandon account, Larry Bodin, "had not been including letters of credit in [Brandon's] combined borrowings" and "did not have a loan facility to use if the letters of credit would have been acted upon by the beneficiary." (Tr. 883-84 (Wolfe).) In addition, Bodin failed to obtain from the USDA adequate documentation to ensure that the USDA's interest in Brandon's inventory and accounts receivable would be subordinate to the Bank's. (Tr. 761-66.) Bodin resigned in October 1998 in part due to this mishandling of Brandon's account. (Tr. 758-61.)

When Wolfe took over as the loan officer responsible for Brandon's accounts, he submitted a loan presentation to the Bank's board of directors in January 1999, seeking to remedy Bodin's error by combining LOC#1 and LOC#2 and increasing the credit limit to $6.5 million. The loan presentation noted that "[t]he line of credit will also be used to support up to $500m in import and standby Letter of Credit." (Tr. 884-85; Loan Presentation, Ex. 13.) The Bank approved this transaction in late January 1999 and formally adopted it on April 29, 1999, but waited until it obtained both the proper documentation from the USDA and the Audit on or about May 1, 1999 before implementing the changes. (Tr. 766-67.)

The evidence supports the Bank's claim that GKCO knew about the plan to increase and combine Brandon's existing lines of credit. The Bank did not, however, present any evidence suggesting that GKCO also knew of the Bank's intent to use the Audit in determining whether to extend additional credit to Brandon in July 1999. GKCO argues that a similar situation was

23

addressed in *Compass Bank v. King Griffin & Adamson P.C.*, No. Civ. A. 3:01-CV-2028-N, 2003 WL 22077721 (N.D. Tex. Sept. 5, 2003), *aff'd*, 388 F.3d 504 (5th Cir. 2004). The auditor in *Compass Bank*, King Griffin & Adamson P.C. and Laurence D. King (collectively, "KGA"), was retained by Webb Cooley Company to audit its 1998 and 1999 financial statements. After receiving the 1998 audit, plaintiff Compass Bank, Webb Cooley's lender, increased Webb Cooley's credit line by $1 million. *Id.* at *1, 5. After receiving the 1999 audit, the bank increased Webb Cooley's credit line by an additional $500,000. *Id.* at *5. When Webb Cooley later defaulted on its loans, the bank sued KGA for negligent misrepresentation, claiming that its inaccurate audits caused the bank to extend additional credit to Webb Cooley. *Id.* at *1. KGA moved for summary judgment, arguing that it did not know the bank intended to rely on the audits in extending the additional credit. *Id.*

The court first held that KGA could not be liable with respect to the 1998 audit because Webb Cooley never told KGA that the audit would be provided to the bank. *Id.* at *5. With respect to the 1999 audit, the court looked to comment (j) to § 552(2)(b) of the Restatement (Second) of Torts, which provides that "the liability of the maker of a negligent misrepresentation is limited to the transaction that he intends, or knows that the recipient intends, to influence, or to a substantially similar transaction." *Id.* The court concluded that a new, undisclosed transaction had to be "substantially similar to a contemplated, disclosed transaction that it replaced. Otherwise, the accountant would be subjected to risks he or she could not have assessed or taken into account in the course of the engagement." *Id.* at *8. At the time KGA issued its 1999 audit in April 2000, KGA knew that the bank had extended Webb Cooley an additional $1 million in March 2000, but did not know the bank planned to extend an additional $500,000 in May 2000.

> There was no proposed $490,000 extension, for example, to which the actual $500,000 could be substantially similar. The mere fact that Webb Cooley had undertaken similar lending transactions with Compass in the past does not make an undisclosed future $500,000 increase substantially similar to the past transactions within the meaning of section 552(2)(b).

24

*Id.* Thus, the court held that KGA was not liable to the bank on the $500,000 credit extension based on the 1999 audit. *Id.*

In this case, similarly, there is no evidence to suggest that GKCO knew that the Bank intended to advance Brandon the additional $500,000 under the Business Note in July 1999. Indeed, by the time the Bank received the Audit, the data it presented was four months old and the Bank had received some six borrower's certificates prepared by Brandon which provided more up-to-date information regarding the company's troubled financial situation. (Borrower's Certificates of 1/19/99, 1/26/99, 2/4/99, 3/10/99, 4/2/99, and 4/7/99, Ex. 16.) This does not, however, refute that GKCO had a duty to the Bank with respect to the $500,000 increase to the lines of credit in May 1999.

## II. Reliance and Causation

Even assuming GKCO had a duty to the Bank, GKCO argues, the Bank has not proven that it relied on misrepresentations made in the Audit; that such reliance was reasonable; or that its reasonable reliance proximately caused the damages it claims.[15] *Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 335 (7th Cir. 1999). Viewing the loan history as a whole, the court agrees. In March 1998, Brandon was already in debt to the Bank in the amount of approximately $9 million. At that time, Brandon requested additional funds to keep operating; the Bank responded by extending a second $2 million line of credit for working capital (LOC#2). (Tr. 756-58 (Wolfe).) As of December 31, 1998, Brandon's debt to the Bank totaled $9,354,093, consisting of $4,175,675 due on the term loan; $4 million due on LOC#1; and $1,178,418 due on LOC#2. (UF ¶ 12.)

By the end of 1998 and early 1999, the Bank, presumably in recognition of Brandon's difficulties, had decided that it wanted to move Brandon's loans out of the Bank. Around that time, the Bank told Brandon's owners to look for other sources of financing, prompting the company to

---

[15]     With respect to the breach of contract claim, the Bank must prove that GKCO's breach proximately caused the damages.

engage in discussions with Wells Fargo and Bank of America. (Tr. 902-03, 905-06 (Wolfe).) Nevertheless, during 1998 and part of 1999, the Bank extended additional credit to Brandon by issuing letters of credit. (UF ¶ 15.) In addition, in January 1999, Wolfe went forward with a loan presentation requesting not only that Brandon's revolving lines of credit be increased, but also that they be combined and renewed. This loan presentation was based on interim financial statements provided by Brandon in November 1998. (Tr. 887-88.) Wolfe and the other Bank employees who helped him prepare the loan presentation determined from those documents that the collateral value for Brandon's accounts receivable was $2,924,000; the net collateral value for the inventory was $3,555,000; and the net collateral value of the fixed assets was $963,000, for a total of $7,442,000. (Tr. 886-89; Ex. 13.) The loan presentation also confirmed that as of January 1999, the Bank had loaned Brandon $9,433,000, and had committed to lending up to $10,675,000. (Tr. 889-90.)

Overall, the Bank knew that Brandon had a shortfall between the net discounted value of its collateral and the total outstanding loans and commitments in the amount of at least $1,013,000.[16] (Tr. 889-92.) The loan presentation also noted that the $2 million line of credit extended to Brandon in March 1998 (LOC#2) constituted "working capital overline in order to facilitate the cash flow issues developed by the company in 1997." (Loan Presentation, Ex. 13, at 626; Tr. 900-01.) The Bank nonetheless was willing to increase Brandon's line of credit, in part because the USDA had guaranteed up to 80% of the term loan, and the board of directors approved the request in late January 1999. (Tr. 881-81, 892-93 (Wolfe); UF ¶ 16; Ex. 13, Loan Presentation of 1/26/99.)

When LOC#2 matured on March 31, 1999, the Bank knew that Brandon "certainly did not have the funds to extinguish the note" and the Bank could have decided not to renew it. (Tr. 906-

---

[16]     In fact, the $1 million figure in the loan presentation was incorrect; Brandon actually had a shortfall of approximately $2 million ($7,442,000 - $9,433,000). (Tr. 889-92.)

07 (Wolfe).) Instead, the Bank renewed LOC#2 for 30 days until May 1, 1999. (Id.) Then on April 29, 1999, Wolfe prepared a second loan presentation to the Bank's board, seeking a waiver of Brandon's financial covenants and final approval to combine the lines of credit and increase that combined credit line by $500,000. (Loan Presentation of 4/29/99, Ex. 25, at 641.) That loan presentation expressly stated that the "[r]enewal [of the lines of credit] is in place to allow Brandon Apparel to obtain alternate financing to payout JB [Johnson Bank]." (Loan Presentation of 4/29/99, Ex. 25, at 642.) The presentation also granted Brandon a policy exception allowing it to take an advance on up to 50% (rather than the customary 25%) of its inventory. (Tr. 909-10.) Further, the presentation reflected that Brandon had a shortfall on its line of credit and on the term loan. (Tr. 913-14.)

Wolfe claims that the Bank's approval of the increase to the line of credit was conditioned on receipt of the Audit, and that the Bank would not have extended the line of credit if it had the benefit of Professor Rittenberg's calculations. (Tr. 583-84.) Wolfe acknowledged, however, that he recommended, and the Bank approved, the line of credit changes before the Bank received the Audit, and based on financial statements prepared by Brandon. One such financial statement was a May 17, 1999 borrower's certificate reporting finished goods inventory that was approximately the same as the one reflected in the Audit ($7,016,150) but an accounts receivable figure that was approximately 50% higher ($3,842,702). (Tr. 625-26, 914-17, 951-53 (Wolfe); Loan Presentation of 4/29/99, Ex. 25, at 646 (indicating that the December 31, 1998 figures were from a "Co.Prep'd" statement); Ex. 16.) Wolfe also conceded that the other potential lending institutions—Wells Fargo and Bank of America—both declined to refinance Brandon's line of credit or term loan, though they similarly did not have any revised calculations provided by Professor Rittenberg. (Tr. 570-71.)

As of April 30, 1999, Brandon's outstanding debt due to the Bank (excluding letters of credit and overdrafts) exceeded $9,900,000. Brandon also had a $40,000 negative balance in its checking account at the Bank, and the Bank had issued a letter of credit on Brandon's behalf with

27

an exposure of approximately $51,000. Thus, the Bank's total exposure to Brandon as of April 30, 1999 was approximately $10 million. (UF ¶ 17.)

Wolfe acknowledged that the Audit confirmed that Brandon was highly leveraged. (Tr. 743.) (*See also* Loan Presentation of 4/29/99, Ex. 25, at 642 ("Leverage is high at 16:1").) He also understood that if Brandon did not prevail in its lawsuit against Pearson, the $1 million amount "would be added [to Brandon's balance sheet] as a liability." (Tr. 549-50.) The Audit accurately showed that Brandon was in violation of its three financial covenants, thus in breach of a condition that the Bank agreed to waive before receiving the Audit and without talking to anyone at GKCO. (Tr. 553-57.) Wolfe understood that the figures in the Audit related to December 31, 1998 and did not include changes occurring between that date and May 1, 1999 when the Bank received the Audit. (Tr. 750-52.) For that more recent data, the Bank relied on Brandon's internally-prepared financial statement dated May 14, 1999. By Wolfe's own admission, that statement showed that from December 31, 1998 to March 31, 1999, Brandon's equity had declined by $20,000 and its debt to the Bank had increased by approximately $600,000; in other words, Brandon's debt to equity ratio was getting worse. (Tr. 752-55; Ex. 20.) Upon receiving the Audit, Wolfe did not distribute it to any other bank officers or employees, nor did he prepare a memo discussing its results. (Tr. 926, 928-29.) Though it was the Bank's practice to prepare a spread sheet of the figures in an audit, the Bank did not do so with respect to the Audit. (Tr. 929.)

Wolfe conceded that during 1999, Brandon was often in violation of the Bank's overdraft policy, which discourages chronic overdrafting on accounts. (Tr. 943-44.) The Bank responded by loaning Brandon additional funds to cover the negative balance in its checking account. (Tr. 773-76.) On July 15, 1999, the Bank agreed to loan Brandon an additional $500,000 (for a total loan value of $7,000,000) evidenced by a Business Note set to mature and be paid in full by September 1, 1999. (UF ¶ 25.) None of Brandon's recent borrower's certificates, however, justified such an extension. To the contrary, the June 3, 1999 certificate indicated that Brandon's

28

total loan value was $6,505,445 and the June 28, 1999 certificate indicated that Brandon's total loan value was $6,671,785. (Ex. 16; Tr. 953-54.) By September 1, 1999, Brandon had not paid off the $500,000 Business Note; was behind on two term loan monthly payments and interest payments; and had maximized its $6.5 million line of credit. (Tr. 957.) Rather than commence litigation at that point, the Bank chose to enter into a Moratorium Agreement with Brandon, requiring full payment by November 1, 1999. Brandon ultimately paid off the $500,000 Business Note, but failed to pay off its remaining indebtedness by November 1, 1999. (Tr. 960-62.) Despite this violation, the Bank entered into a Second Moratorium Agreement with Brandon on January 21, 2000 rather than initiate litigation or sweep Brandon's accounts. (Tr. 586-87, 962.)

In the court's view, this loan history does not support the Bank's claim that it relied on the Audit in extending credit to Brandon, much less that any such reliance was reasonable. No documentary evidence supports the Bank's assertion that it relied on the Audit; steps were in the works to proceed with additional lending to Brandon well prior to its receipt. So far as the record shows, Mr. Wolfe did not so much as send a copy of the Audit statement along to any other lending officer. And Mr. Wolfe took no note and expressed no concern regarding discrepancies between Brandon's records and the audited statement.

If the Bank relied on the Audit at all, its reliance on the document as support for additional lending was not reasonable. The Audit fairly disclosed that Brandon had financial problems and Wolfe admitted that the Bank essentially did nothing with the Audit upon its receipt except to place it in the file. Significantly, the Audit was four months out-of-date by the time the Bank received it, and Wolfe admitted that the Bank relied upon more recent internal financial statements and borrower's certificates prepared and supplied by Brandon, all of which reflected that Brandon's financial condition was getting worse. The Bank knew both before and after receiving the Audit that Brandon's checking account frequently had a negative balance and that the company repeatedly defaulted on its obligations to the Bank. Nevertheless, the Bank continued to extend credit to

29

Brandon and opted neither to declare the company in default nor to initiate litigation proceedings until April 16, 2001.

Perhaps most compelling is the fact that Wolfe was unable to confirm that if the Bank had never received the Audit in May 1999, it would not have loaned Brandon additional funds. His testimony on the matter was far more equivocal:

> It [the Audit] was an important part of the credit facility. It certainly impacted our primary – one of our primary issues, being the guarantee of the United States Department of Agriculture, that an audit be performed to protect our guarantee. That was one of the factors that I'm sure we'[d] have had to consider, as well as many more.

(Tr. 966-67.) On these facts, the Bank has not established that it reasonably relied on the Audit in extending credit to Brandon, or that such reliance proximately caused its damages in this case.

## III.     Damages

Having determined that the Bank has not proven reasonable reliance or proximate cause, the court need not devote significant attention to the issue of damages. The court will, however, make a few observations in that regard. As noted in the court's earlier decision regarding the Bank's damages theories, "few authorities directly address the appropriate measure of damages" for accountant malpractice. *Johnson Bank*, at 2-3. A damage award may not be based on "mere speculation, hypothesis, conjecture, or whim"; at the same time, "[a]bsolute certainty as to the amount of damage" is not required as long as the evidence establishes a basis for an award with a "fair degree of probability." *De Koven Drug Co. v. First Nat'l Bank of Evergreen Park*, 27 Ill. App. 3d 798, 802, 327 N.E.2d 378, 380, 381 (1st Dist. 1975). Where an award requires a determination of a company's financial condition at a certain point in time, expert testimony may be required. *Johnson Bank*, at 4-5 (citing *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1373 (7th Cir. 1985) (affirming jury verdict awarding buyer of closely-held company $1.3 million where both parties'

expert witnesses were able to make a "just and reasonable" estimate of the company's actual earnings at the time of the sale).

The Bank seeks to recover additional amounts it loaned to Brandon after May 1999, $1,288,000; 10% of Brandon's inventory (approximately $700,000) and 30% of Brandon's accounts receivable (approximately $1,092,000), for a total of $1,792,000; and payments from Midwest deposited into Brandon's account between May and December 1999, $1,011,000. For the reasons explained below, even if the Bank could establish GKCO's liability, the court concludes that each of these measures of damages is flawed.

### 1.    Additional Loans

First, the Bank argues that it would not have advanced Brandon an additional $1,288,000 after May 1999 if the Audit had fairly and accurately stated Brandon's financial condition at that time.  (Pl. Mem. at 33 ¶ 10.)  GKCO insists that the Bank has vastly overstated the "actual net amount advanced by the Bank to Brandon in or after May 1999."  (Def. Mem. at 33 ¶ 11.) Specifically, GKCO claims that the Bank has failed to account for the fact that many of the advances were used to make loan payments to the Bank and/or to cover a negative balance in Brandon's checking account.  GKCO's expert, Donald L. Brenner of the Brenner Group, a consulting firm specializing in financial investigation, accounting, auditing, and economic evaluations, testified that the actual net increase in total principal loans outstanding from April 30, 1999 to December 31, 1999 was only $324,000.  (Tr. 1548, 1992-93.)

GKCO's position finds significant support in the record.  The $1,288,000 figure is based on gross deposits into Brandon's account between May and December 1999.  It does not take into account the fact that Brandon was required to make certain payments to remain in business; for example, its licensors were entitled to 8 or 9 percent of those funds.  (Tr. 786-87 (Wolfe).)  Nor does it take into account the fact that Brandon wrote checks for various purposes and had

31

preauthorized deductions taken from its account during that time. Significantly, the Bank made advances to Brandon on May 20, 1999 ($249,000) and June 1, 1999 ($87,920) to cover overdrafts and leave a cushion in its checking account. (Tr. 576-77, 580-82, 772-76; Exs. 11, 24.) Wolfe admitted that he does not know how much money Brandon would have had in its checking account by December 31, 1999; what expenses Brandon would have paid; or what payments Brandon would have received absent the $1,288,000 in advances and readvances from the Bank. "[C]hanging the variables would obviously change the outcome, so in that extent there would be some uncertainty, yes." (Tr. 828 (Wolfe).)

The Bank's calculation also fails to take into account that Brandon used some of the monies to make payments directly back to the Bank. On May 20, 1999, the Bank advanced Brandon a total of $146,470.44, which Brandon immediately used to make a monthly payment on the term loan ($80,445.39) and two interest payments on the lines of credit (one in the amount of $44,916.67 and one in the amount of $21,208.38). (Tr. 576-77, 731-34, 736-37, 953; Ex. 11, at 581.) On June 22, 1999, the Bank advanced Brandon $51,375 to help cover a letter of credit that had expired without payment. (Tr. 805-12.) On July 16, 1999, Brandon used a total of $205,266.70 in advances made under the July 15, 1999 Business Note to pay interest on LOC#2 ($44,375.92) and to pay the June and July 1999 monthly payments on the term loan (totaling $160,890.78). (Tr. 895-99.)

Wolfe does not know whether Brandon would have paid the Bank $110,000 on August 4, 1999; $130,000 on August 18, 1999; $32,000 on August 24, 1999; $12,000 on September 1 and 2, 1999; $75,000 on December 20, 1999; or $25,000 on January 31, 2000 if the Bank had initiated liquidation proceedings in May 1999. (Tr. 830, 832-35, 837-40.) Indeed, to the extent the Bank loaned those amounts to Brandon, it is not clear that Brandon would otherwise have had sufficient funds to make each subsequent payment. (Tr. 828-40.) Wolfe also does not know whether Brandon would have cooperated with a liquidation in May 1999, or whether the Bank would have

32

been required to initiate litigation. (Tr. 855-56.) In the court's view, it is not reasonable to conclude that Brandon would have cooperated in May 1999 given its refusal to do so in early 2000. In any event, there is no evidence from which the court could determine what difference the timing would have made. Although the Bank makes much of the notion that an orderly liquidation in May 1999 would have given it "control" over Brandon's overdrafts, Mr. Wolfe admitted that whether Brandon took overdrafts, on its own or with advance notice to the Bank, the Bank would have been "out of pocket" in the same amount. The Bank did not otherwise explain how orderliness would have netted it any greater recovery.

Based on the foregoing, the court does not believe that the additional loans extended to Brandon between May and December 1999 exceeds $324,000 as postured by Mr. Brenner. Significantly, Brandon had more than that amount, $358,335.79, in its checking account as of December 31, 1999. Though Brandon was in default on the first Moratorium Agreement at that time, the Bank chose not to sweep the account to offset its losses. Nor did the Bank sweep the $528,157.58 that was in Brandon's account as of January 18, 2000, opting instead to enter into a Second Moratorium Agreement. (Tr. 963-65 (Wolfe).) Thus, the Bank has not established a basis for recovery under the additional loans theory.

### 2. Percentage of Inventory

The Bank also seeks to recover 25-30% of the $6.2 million deposited into Brandon's account between May and December 1999, excluding loan advances. This includes 10% of Brandon's inventory (approximately $700,000) and 30% of Brandon's accounts receivable (approximately $1,092,000), for a total of $1,792,000. The Bank failed to call an expert witness to testify regarding the actual value of Brandon's inventory in May 1999, or the amount of inventory and accounts receivable that could have been converted into cash and collected by the Bank at that time. *See, e.g., U.C. Castings*, 754 F.2d at 1373. Professor Rittenberg and Wolfe both

33

acknowledged that they themselves do not know Brandon's liquidation value as of May 1, 1999. (Tr. 258-59, 982.) More importantly, as noted during the trial, this damages theory was not properly disclosed during discovery or in the final pretrial order. (Tr. 606-19.) For this reason alone, it is not a proper basis for recovery. *See, e.g., Gorlikowski v. Tolbert*, 52 F.3d 1439, 1445 (7th Cir. 1995) (district court did not abuse its discretion in refusing to revise jury instructions to reflect the defendant's causation defense where that theory was not disclosed during discovery or in the pretrial order but was known and available prior to trial).

### 3. Midwest Deposits

The Bank finally seeks to recover $1,011,000, representing the amounts Midwest deposited into Brandon's account from May to December 1999. GKCO urges that this claim for damages is too speculative. Once again, GKCO's argument finds ample support in the record. There is simply no evidence to support the Bank's insistence that Midwest would have continued making royalty payments to Brandon between May and December 1999 if the Bank had initiated liquidation proceedings in May. At trial, the court sustained GKCO's objection to admission of the license agreement between Brandon and Midwest because it had not been disclosed during discovery.[17] (Tr. 651-53.) The Bank has offered no explanation for its failure to call a witness from Brandon and/or Midwest or any expert who could testify that the Bank stood to recover from Brandon in the event of an earlier liquidation. Thus, there is no evidence to support the Bank's assertion that the royalty payments would have continued.

To the contrary, Wolfe admitted that after the Bank filed suit against Brandon on March 8, 2000, deposits into Brandon's account "waned significantly." (Tr. 860.) Specifically, Brandon received just $135,261.60 in April 2000; $59,165.01 in May 2000; $18,817.21 in June 2000; and $5,107.30 in July 2000. (Tr. 859-60.) It is reasonable to conclude that similar declines would have

---

[17]     Nor did the Bank offer any witness who could establish the authenticity of the document. In any event, the version of the contract that was offered by the Bank expired in 1998.

occurred in 1999 had the Bank commenced liquidation proceedings at that point. The Bank would likely have been forced to file suit against Brandon as well; as noted earlier, it is not reasonable to conclude that Brandon would have cooperated in May 1999 when it declined to do so in early 2000.

In any event, it appears that Brandon did use the Midwest deposits to make payments to the Bank. For example, Brandon paid the Bank $44,375.92 on July 16, 1999, the day after Brandon received a $129,000 deposit from Midwest. In addition, the Bank swept $130,000 from Brandon's account on August 18, 1999, the same day Brandon received a $182,945.98 deposit from Midwest; prior to receiving that Midwest deposit, Brandon had only $13,639.48 in its account. (Tr. 1035-36 (Wolfe).) On September 15, 1999, Brandon received a deposit from Midwest in the amount of $237,331.84; on September 14 and 17, 1999, Brandon made two separate $125,000 payments to the Bank. (Tr. 1038-39; Exs. 11, 24.)

On this record, the Bank has not established that it would have recovered $1,011,000 in additional royalty payments from Midwest had the Bank commenced liquidation proceedings in May 1999.

## CONCLUSION

For the reasons stated above, Johnson Bank has not met its burden of establishing that it reasonably relied upon the Audit from GKCO, or that the Audit was the proximate cause of any damages in this case. Nor has the Bank proven that it would have been entitled to damages in the amounts claimed. Judgment is entered in favor of Defendant GKCO and against Plaintiff Bank.

ENTER:

Dated: August 3, 2005

REBECCA R. PALLMEYER
United States District Judge

35